Lawrence E. **MONTAGUE, Jr.,** et al.,
Appellants,

v.

Willie Oneida **BRASSELL** et vir, Appellees.

No. 7044.

Court of Civil Appeals of Texas.

Beaumont.

May 15, 1969.

Rehearing Denied June 5, 1969.

Beck & Beck, Beaumont, for appellants.

W. O. Bowers, Jr., Beaumont, John P. Ritchie, Mineral Wells, for appellees.

STEPHENSON, Justice.

Willie Oneida Brassell brought this action against Lawrence E. Montague, Jr., independent executor of the estate of Lawrence E. Montague, deceased. This action is one for damages for waste, or diminution in the value of the security upon which plaintiff had a deed of trust lien. In essence, the cause of action is to recover a specific $2,346.95 in the hands of defendant. Trial was before the court, and judgment was rendered for plaintiff as prayed. The parties will be referred to here as they were in the trial court.

The evidence showed the following: That plaintiff and Lawrence E. Montague, Sr. were divorced February 16, 1959, and in the settlement of their community estate, he conveyed to plaintiff a one-half interest in certain royalties, and gave plaintiff a note for $10,000.00 secured by the other one-half of the same royalties. That such royalties had been producing since 1955. That this was payable in annual installments of $1,295.10 each, beginning February 16, 1960, and the following payments were made: February 16, 1960—$1,295.10; February 16, 1961, February 16, 1962 and February 16, 1963—$295.00 each. That Lawrence Montague, Sr. died June 13, 1963. That defendant was appointed by the probate court July 20, 1963. That plaintiff filed a claim on such note September 10, 1963. That such claim was allowed as a preferred claim September 11, 1963. That the deed of trust securing such note was foreclosed and trustee's deed given to plaintiff April 7, 1965. That plaintiff's deed of trust, in the usual form, contained the provision that mortgagor should keep the property in good repair and condition. That the $2,346.95 awarded to plaintiff by the trial court was the amount of royalty checks received by defendant from September 10, 1963 (date claim filed) to April 7, 1965 (date deed of trust foreclosed) from the royalties upon which plaintiff had this lien mentioned.

The trial court found, among others, the following conclusions of law:

That the fee royalty, upon which plaintiff had such lien, was damaged or reduced in value by $2,346.95.

That plaintiff did not have the right to secure the royalty payments from the producer, either before or after her claim was presented and approved, such actions not operating as an assignment of the oil and gas runs.

Defendant's first point of error is that plaintiff was not entitled to the judgment rendered because of Section 306(c) of the Probate Code, V.A.T.S., which reads as follows:

"(c) Approved Claim as Preferred Lien Against Property. When an indebtedness has been allowed and approved under Paragraph (2) of Subsection (a) hereof, no further claim shall be made

against other assets of the estate by reason thereof, but the same thereafter shall remain a preferred lien against the property securing same, and the property shall remain security for the debt in any distribution or sale thereof prior to final maturity and payment of the debt."

This point of error is sustained.

The plaintiff had the right to proceed to the sale of the mortgaged property under the deed of trust or through court proceedings without the necessity of presenting the same for approval to the independent executor. Fischer v. Britton, 125 Tex. 505, 83 S.W.2d 305, 306 (1935) (under the prior statute) and Bunting v. Pearson, 430 S.W.2d 470 (Tex.Sup., 1968) (under the Probate Code).

Had plaintiff elected so to do under the trust powers contained in the deed of trust, the foreclosure could have been consummated within a matter of weeks after the death of the testator; or, if the plaintiff elected to proceed with a judicial foreclosure, an ancillary receivership or garnishment would have been sufficient to assure that the payments which accrued during the pendency of the foreclosure proceedings would have been available for application upon the indebtedness. Article 2293, § 2, V.A.C.S.; Article 4076, V.A.C.S. Texas Co. v. Kent, 60 S.W.2d 857, 860 (Waco, Tex.Civ.App., 1933, no writ). Cf. Cocke v. Naumann, 188 S.W.2d 781, 783 (Dallas, Tex.Civ.App., 1945, error ref. want of merit).

Rather than pursue either of the direct methods to protect her interest in the payments, plaintiff chose to present her claim under the provisions of the Probate Code, § 306(a) (2), the material provisions of which read as follows:

§ 306 "(a) Specifications of Claim. When a secured claim against an estate is presented, the claimant shall specify therein, in addition to all other matters required to be specified in claims:

\*  \*  \*  \*  \*  \*

"(2) Whether it is desired to have the claim allowed approved, and fixed as a preferred debt and lien against the specific property securing the indebtedness and paid according to the terms of the contract which secured the lien, in which event it shall be so allowed and approved if it is a valid lien; \*  \*  \*."

In so doing, plaintiff became subject to the restrictions contained in § 306 (c), quoted above, which provide that in such event "no further claim shall be made against other assets of the estate by reason thereof." Having chosen to proceed under the Probate Code, plaintiff cannot now reach the sums received by the executor after presentation of the claim and prior to foreclosure, since such were "other assets of the estate." Probate Code, § 306(c). In construing the predecessor statute (Article 3515a, V.A.C.S.), the Supreme Court in Wyatt v. Morse, 129 Tex. 199, 102 S.W.2d 396, 399 (1937) said:

"In return for this preference the claimants so electing are required to forego making further claim against other assets of the estate."

Defendant's next point of error is that the trial court erred in rendering its judgment because defendant was not liable for waste. This point of error is also sustained.

Defendant's testator was the mortgagor in possession of the property upon which plaintiff had her lien and the record clearly shows that there was production from the lands for four years before, and at all times subsequent to the execution of the mortgage. The rule is stated in Thornton, Oil and Gas (5th Ed.), Vol. 2, 1932, p. 1048, Sec. 746, as follows:

"The mortgagor of gas, oil or mining lands may extract the oil or gas or remove the minerals, and convert them into money, if the gas or oil wells or mine operated were dug or opened at the time the mortgage was placed upon

the premises; but if they were not, then the lands cannot be so worked, for it is waste as against the mortgagee to permit it, even though the land was purchased as mineral land."

Therefore, the testator during his lifetime and his executor after his death, rightfully received the payments of the oil runs from the property *before foreclosure.* 3 Summers Oil & Gas 705, § 557; 59 C.J.S. Mortgages § 316, p. 410; Onyx Ref. Co. v. Evans Prod. Corp., 182 F.Supp. 253 (DC ND Tex., 1959); Texas Co. v. Kent, supra; Cf. Federal Land Bank of New Orleans v. Mulhern, 180 La. 627, 157 So. 370, 373, 95 A.L.R. 948, 953 (1934).

◾ Thus, until plaintiff exercised her right to foreclose the lien, the defendant had the right to continue receiving the payments from the oil production. Willis v. Moore, 59 Tex. 628, 638 (1883); McGeorge v. Henrie, 94 S.W.2d 761, 762 (Texarkana, Tex.Civ.App., 1936, no writ); Simon v. State Mut. Life Assur. Co., 126 S.W.2d 682, 686 (Dallas, Tex.Civ.App., 1939, error ref.). Thornton, Oil and Gas (5th Ed) Vol. 2, 1932, p. 1049, Sec. 747. The royalties received by defendant after the death of his testator and prior to the foreclosure of plaintiff's lien, therefore, became a part of the general estate of the testator. Security Mortgage & Trust Co. v. Gill, 8 Tex.Civ.App. 358, 27 S.W. 835, 836 (1894, error ref.). Plaintiff has not shown any entitlement to a *second* preference.

We have been cited no cases passing directly upon the questions raised in this case. The closest analogy that we have found is the rule applicable to statutory liens. Certainly, the contractual lien which plaintiff had is no stronger than the statutory lien created by an abstract of judgment which will attach to the royalty because it is an interest in land, but will not attach to money received from the production of oil therefrom. In Donley v. Youngstown Sheet & Tube Company, 328 S.W.2d 192, 196 (Eastland, Tex.Civ.App., 1959, error ref. n. r. e.), it is said:

"In Texas, where royalty is realty, the filing of an abstract of judgment fixes a lien against royalty. 49 C.J.S. Judgments § 482, p. 922. *A judgment lien attaches to realty but not to rents, issues and profits therefrom.* 49 C.J.S. Judgments § 472, pp. 906, 907." (Emphasis ours).

In Donley, while the parties were litigating over the validity of the judgment liens, an oil company continued production from the wells on the land and paid the money into the registry of the court. The court said that the trial court held correctly that the liens attached to the royalty, but in awarding the money to the lien holder, it was in error.

As to the award of the money paid into the registry of the court, in Donley, it was said (328 S.W.2d at 197):

"We find no authority for the holding that appellee's judgment liens can be enforced against the money paid into court by Sohio. Said lien holders did not sue for damages or conversion. There was no garnishment. Their right to said money depends solely upon their judgment liens. The statute that created them provides only that abstracts of judgments shall constitute liens on 'real estate'. Such liens do not attach to personal property. * * * [citing authorities] * * * Appellees had no right to, in effect, foreclose their judgment liens against the money paid into court by Sohio."

See also comment in Lange, 3 Texas Land Titles, § 848, p. 356.

The authorities cited in support of the judgment below do not reach the point which we decide here for the simple reason that the facts in our record do not make the same relevant. None of the cases cited by plaintiff involved a *mortgagor in possession* with a right to receive the royalties

resulting from the production of the oil from the land or the presentation of a claim to an independent executor without instituting foreclosure with ancillary, garnishment, or receivership proceedings immediately thereafter. The judgment below, awarding plaintiff a recovery, was and is erroneous, and it becomes our duty now to render the judgment which the court below should have rendered.

The other points of the defendant, having been examined, are found to be without merit and are now overruled.

The judgment of the trial court is now reversed and rendered that plaintiff take nothing by reason of her suit.

KEITH, Justice (concurring).

The result reached by Judge Stephenson is correct. I cannot subscribe to plaintiff's theory that because of the fortuitous circumstance that her creditor made it possible for an independent administration to be established upon his estate, she should be preferred over all other creditors. She, as a creditor, had no control over whether the proceeding should be independent or court-supervised, that choice belonged to her debtor. Nevertheless, and while she followed the language of § 306 (a) (2), Probate Code,[1] almost verbatim, she contends that she is not bound by the limitations of § 306(c), solely because the administration is independent.

The dissent quotes copiously from Bunting v. Pearson, 430 S.W.2d 470 (Tex.Sup., 1968), making it necessary to determine just what was held in Bunting. It is clear now that § 146 does not make applicable to independent proceedings the provisions of

§§ 309, 310, and 313. Thus the *mechanism* set up in these sections for use in court-supervised proceedings does not apply to independently administered estates.[2] The mechanical handling of claims under the cited sections was held, and properly so, incompatible with and not "specifically and explicitly" made applicable to independent proceedings. § 145.

The specific holding in *Bunting* that "[t]he only other part of the Code that this section [§ 146] could have reference to is the section dealing with exempt property and allowances. * * * *" (p. 473), serves to strengthen my position that § 146, far from authorizing an executor so to do, positively forbids an executor preferring one claim over another. Thus, the funeral expenses and expenses of the last illness [Class 1 claims under § 320(a)] can be enforced against *exempt* property, other than the homestead or the allowance in lieu thereof. § 281. The holding of the dissent, in effect, would permit our plaintiff to reach specific sums of money *before* the homestead rights, for instance, were satisfied.[3] I am unwilling to subscribe to a proposition of law which would permit our plaintiff here to reach funds rightfully received by the independent executor to the exclusion of, and in preference to, others of a superior class.

The quotation in the dissent from Humble Oil & Refining Co. v. Andrews, 285 S.W. 894 (El Paso, Tex.Civ.App., 1926, error ref.) is not pertinent to our case. Indeed, in *Andrews,* the very contention which I now espouse (i. e., the mortgagor's personal representative had a right to keep the proceeds of the oil production received before the foreclosure), was advanced by Humble

1. All section references herein are to the Probate Code.

2. The caveat of Professor Woodward, "Some Developments in the Law of Independent Administrations", 37 Tex.Law Rev. 828, 838 (1959), that § 146 might cause §§ 309, 310, and 313 to become pertinent in such administrations, proved to be unfounded.

3. Our record is in an unsatisfactory condition and does not reveal any information as to the solvency of the estate, and status of the expenses of the last illness, homestead rights or allowances in lieu thereof, or otherwise. Nevertheless, and regardless of the existence or non-existence thereof, the dissent would enable the plaintiff, to take the first bite in preference to *all* others.

in support of its contention that the attachment lien did not reach the oil production between the date of the levy and sale. This contention, as applied to the attachment levy then under consideration, was held to "have no present application." (285 S.W. at p. 895, col. 1).

I find no authority for holding that a mortgage lien such as held by our plaintiff authorizes the levy upon funds received from production before foreclosure, whereas, the authorities cited by Judge Stephenson clearly show she has no right thereto. In her trial pleading, plaintiff did not seek judgment for the deficiency established by the foreclosure under the deed of trust. She sought money rightfully in the hands of the independent executor, lawfully received by him from the proceeds of oil runs upon the mortgaged property after presentation of her claim and before the foreclosure of the lien. For the reasons cited in the majority opinion, she was not entitled thereto. Had she sought a general deficiency judgment against the independent executor, with payment in ordinary course [a class 4 claim under § 320(a)], another question would be presented. Such, however, is not our case.

Certainly, *Andrews* does not establish her right to the funds. There could be no conversion of the funds, as in *Andrews,* if for no other reason than the rule of law that such proceeds constituted the property of the mortgagor, not the mortgagee at the time of receipt. The rule with reference to attachment liens, as shown in *Andrews,* is different.

The dissent, conceding "the independent executor of his estate *rightfully* received the monies in payment of the oil runs from the property [covered by the deeds of trust] before foreclosure," then proceeds to uphold plaintiff's claim thereto upon the theory of conversion. This is a *non sequitur*. Conversion is " * * * the unlawful and wrongful exercise of dominion, ownership, or control by one person over the property of another, to the exclusion of the exercise of the same rights by the owner * * *." France v. Gibson, 101 S.W. 536 (Tex.Civ. App., 1907, no writ).[4] If the defendant rightfully received money to which he was entitled, he cannot be held guilty of conversion thereof. Plaintiff having no right of ownership when it was received, cannot later assert that it was converted.

The reference in the dissent to the opinions in the Cartwright cases [Cartwright v. Minton, 318 S.W.2d 449 (Eastland Tex. Civ.App., 1958, error ref. n.r.e.) and Murphy v. Cartwright, 202 F.2d 71 (5th Cir., 1953)] is misplaced. There is no charge of fraud in this case nor is the judgment below in any manner based upon any such implied finding. The relationship between the parties in this case was that of debtor-creditor, and I am willing to accept the proposition that an executor, independent or otherwise, occupies a fiduciary relationship to the estate which he administers. The concession, however, does not alter my position. The facts in the two *Cartwright* cases disclose that fraud, in its classic sense, was practiced by the executor upon the legatees of the estate he was administering. No such situation exists here and the cases have no application.

The majority opinion, having clearly shown that plaintiff may not recover, has reached the correct result and I join therein.

---

4. This definition was quoted with approval in Pan American Pet. Corp. v. Long, 340 F.2d 211, 219 (5th Cir. 1964), with the observation that it has "garnered wide acceptance". See also, Powell v. Forest Oil Corp., 392 S.W.2d 549, 553 (Tex-arkana, Tex.Civ.App., 1965, no writ). Both of the cases cited in this note were "slant hole" cases wherein plaintiffs sought recovery for conversion of the oil produced from the deviated wells.

PARKER, Chief Justice (dissenting).

I respectfully dissent.

The majority opinion sustained appellant's Point of Error No. 1:

"The trial court's judgment is erroneous because the election to have the claim allowed, approved, and fixed as a preferred debt and lien against the specific property securing the indebtedness had the effect under Section 306(c) of the Probate Code of precluding the making of any further claim whatsoever against other assets of the estate."

A claim on the $10,000.00 note was presented to the independent executor on or about the 10th day of September 1963. On the 11th day of September 1963, the executor allowed such claim in full and classified the same as a preferred debt and lien against the specific property securing it. Prior to presentation of the claim, the executor notified Willie Oneida Brassell that the estate did not own enough assets to pay all of its creditors. This being an independent administration under Sections 145 and 146 of the Probate Code, it was the duty of the independent executor to receive presentation of and classify, allow, and pay, or reject claims against the estate in the same order of priority, classification, and proration prescribed in this Code. It was under Section 146 that the independent executor classified the claim as above stated and not under Section 306 of the Probate Code, for there is nothing in the Probate Code explicitly and specifically making Section 306 applicable to an independent executor. Sections 306(a), (b), (c), and (d) are not applicable to an independent executor which was directly held in Bunting v. Pearson, 430 S.W.2d 470 (Tex.Sup., 1968), and on page 473, the court held, referring to Sections 309, 310 and 313 of the Probate Code:

"If, then, we are not compelled to substitute the words 'independent executor' for the term 'representative' in the three sections above discussed, they may not be made applicable to the 'independent executor' unless some provision of the Probate Code explicitly and specifically makes them applicable. It is argued that Section 146 does this very thing. We cannot agree with that argument. Prior to the adoption of the Code the courts had held that 'independent executors' were required to handle claims in accordance with provisions of the statute dealing with classifications, priority and proration of claims. It appears to us that Section 146 carries forward the law in this respect, as it existed prior to the adoption of the code. The phrase "in the same order of priority, classification, and proration prescribed in this code' refers to Sections 322 dealing with classification; 321 dealing with proration; and 320 dealing with priority. The only other part of the Code that this section could have reference to is the section dealing with exempt property and allowances. No language in Section 146 can reasonably be construed to refer to Sections 309, 310, and 313, in such a way as to make them applicable to an 'independent executor.' "

I refer to Section 3(l) of the Probate Code, as follows:

"(1) 'Estate' denotes the real and personal property of a decedent or ward, both as such property originally existed and as from time to time changed in form by sale, reinvestment, or otherwise, and as augmented by any accretions and additions thereto and substitutions therefor, and as diminished by any decreases therein and distributions therefrom."

The majority opinion cites Wyatt v. Morse, 129 Tex. 199, 102 S.W.2d 396, 399 (1937). Such opinion is not applicable for the reason that Morse was an administrator and not an independent executor.

Appellee's claim in full remained a preferred debt and lien against the specific property securing it. I would overrule appellant's Point of Error No. 1.

The majority opinion sustains appellant's Point of Error No. 2 as follows:

"The trial court erred in granting a judgment for damages because production started before the deeds of trust were given and the open mine doctrine prevents Appellant from being liable for waste."

Since there is no life estate or life tenancy involved in this case, the ordinary conception of the open mine doctrine is not applicable. Until the appellee foreclosed her lien through the trustees sale, on April 7, 1965, no cause of action had accrued to her against appellant for his depleting the value of the oil royalty, because, until such sale, it could not be known that she did or did not have full satisfaction of her note, originally in the sum of $10,000.00. See Humble Oil & Refining Co. v. Andrews, 285 S.W. 894 (El Paso, Tex. Civ.App., 1926, error ref.) on page 896:

"No cause of action for damages is complete, *and does not accrue to an attaching creditor against one converting a part of the attached property or depleting the value thereof until a sale of the part remaining has shown that the creditor has not full satisfaction of his judgment.* Deaton v. Rush, 113 Tex. 176, 252 S.W. 1025; Paxton v. Meyer, 67 Tex. 96, 2 S.W. 817; Sherwood v. Sherwood (Tex. Civ.App.) 225 S.W. 555." (Emphasis added.)

Such sales of April 7th, 1965 realized $7,-850.00, leaving a balance owing on said note of $3,831.00. The sales by the trustee related back to the fixing of the liens on February 16th, 1959, so as to exclude adverse interests arising subsequent to the fixing of the liens.

The deeds of trust to W. O. Bowers, Jr. contained no provision for the assignment of oil runs to appellee. Before foreclosure, appellant had the right to continue receiving the payments from the oil production in the form of money. As to the royalty involved in the cause, the instrument

creating the mineral royalties in issue provided:

"No change of ownership of said royalties or any part thereof, however accomplished, ever shall operate to impose any additional obligation or burden upon Grantee, or to diminish its rights hereunder; and Grantee shall not be required to take notice for any purpose of any such change or devolution of ownership until Grantee has been furnished with the original instrument, a certified copy, or other legal evidence showing such change of ownership."

During Lawrence E. Montague's lifetime, he received the royalties that belonged to his divorced wife, as well as his one-half of the royalties covered by the deed of trust securing the payment of $10,000.00 to his former wife. The appellant continued to receive $1,089.50 of the royalties to which title was vested in appellee. The judgment provides for the recovery of said sum and there is no appeal therefrom. Also, Lawrence E. Montague, Jr., as independent executor, received $2,346.95 in money from the royalties pledged to secure the payment of the $10,000.00 note, which he was able to trace and admitted to be correct. After the death of Lawrence E. Montague, the independent executor of his estate rightfully received the monies in payment of the oil runs from the property before foreclosure. To this extent, I agree with the majority opinion. However, we do continue to have in Texas a blended system of equity and law.

The majority opinion cites Donley v. Youngstown Sheet and Tube Company, 328 S.W.2d 192, 196 (Eastland, Tex.Civ.App., 1959, error ref. n. r. e.) as supporting the reversal and rendition of the judgment of the trial court. In that case, Youngstown Sheet and Tube Company was the owner of an abstract of a judgment against Sabens, filed for record in Taylor County on May 19, 1951. An abstract of a judgment against Sabens, filed for record on July 13, 1951, was owned by Claude S. Holly.

Sabens owned royalty interest in Taylor County. Neither of the owners of abstract of judgments attempted to levy upon and sell under execution or otherwise the real property owned by Sabens in Taylor County. Sohio deposited into the registry of the court an amount of money equal to the value of the oil produced attributable to Sabens' and Youngstown's interests in the royalty produced after the filing of the abstract of judgments. The Eastland Court of Civil Appeals held that said abstract of judgment liens, with no pleadings for damages or conversion, did not follow the money paid in the court by Sohio, and reversed the trial court's judgment and remanded the cause for proceedings in accordance with its opinion. On page 197, the Eastland Court said:

"Humble Oil & Refining Company v. Andrews, Tex.Civ.App., 285 S.W. 894 (Writ Ref.) and State ex rel. Attorney General v. Hatcher, 115 Tex. 332, 281 S.W. 192, are, apparently, urged as supporting the lienhholder's judgment for the money. In Humble Oil & Refining Company v. Andrews plaintiff's cause of action was for damages for conversion. It was there held that a cause of action for conversion of attached property or for depleting the security did not accrue until a sale of the remaining security showed the creditor could not collect his judgment therefrom."

Only one meaning can be had from the opinion in Donley v. Youngstown Sheet and Tube Company, supra, remanding the cause for proceedings in accordance with its opinion. That meaning is that Youngstown should first proceed under its abstract of judgment and sell the property subject to its lien, and if the lien was not fully satisfied, then Youngstown could sue for the money deposited into the registry of the court by Sohio for depleting the value of the real property covered by the lien, which is waste, to the end that the creditor, Youngstown, had full satisfaction of its abstract of judgment.

Appellant's argument on the law of waste, in discussing the trial court's conclusions of law, which appellant contends are erroneous, states:

"The open mine doctrine which the courts of this state follow, 42 Tex.Jur.2d, Oil and Gas, Sec. 27, P. 67–70, keeps him from being impeachable for waste."

This Section 27 has no application to the question before this court. Then the appellant states:

"The rule the trial court violated was stated some 36 years ago in the following manner:

" 'The mortgagor of gas, oil or mining lands may extract the oil or gas or remove the minerals, and convert them into money, if the gas or oil wells or mine operated were dug or opened at the time the mortgage was placed upon the premises; but if they were not, then the lands cannot be so worked, for it is waste as against the mortgagee to permit it, even though the land was purchased as mineral land.' Thornton, Oil and Gas, Vol. 2, 1932, P. 1048, Sec. 746.

"Appellant submits that the trial court's judgment cannot stand in view of the well settled open mine doctrine of this state and should therefore be reversed."

The foregoing is the entire argument of the appellant in this case. But appellant does not quote all of Section 746, as follows:

"To remove and convert into money minerals underlying the soil is not waste, unless it was necessary to penetrate the soil to secure such minerals. The only restriction on the mortgagor is that he must not endanger or seriously impair the lien of the mortgage. In one case, after decree of foreclosure and execution issued, the mortgagor quarried stone from a quarry, already open; and it was held that as between him and the

mortgagee, the latter was entitled to the stone."

But Thornton cites no Texas opinions. On page 1049, under Section 747 of Thornton's text, it is said:

"But if the operations proceed so far as to endanger the security, then the holder of it is entitled to an injunction restraining the further operation of the mine."

The majority opinion also cites Federal Land Bank of New Orleans v. Mulhern, 80 La. 627, 157 So. 370, 95 A.L.R. 948 (1934). On page 375 of 157 So., on page 955 of 95 A.L.R. from that opinion, we would quote:

"But, when production is reached and gas and oil are abstracted and reduced to possession and ownership, the fee is diminished and impaired to the extent of the value of the gas or oil abstracted and used. The use of the gas or oil extracted is a 'conversion of the fee pro tanto, or, as expressed at common law, waste,' which was prohibited under these mortgages."

Significantly, the Louisiana Supreme Court cites no authority involving oil land mortgages in arriving at its judgment.

The majority opinion cites Texas Co. v. Kent, 60 S.W.2d 857 (Waco, Tex.Civ.App., 1933, no writ). Contrary to the construction of such case by the majority opinion, such decision supports the judgment of the trial court in the instant case.

Central Texas Refining Company was an insolvent corporation. R. L. Wheelock was appointed receiver of said corporation, and all its properties were placed in his hands, and he thereafter operated the same under orders of the court. All its creditors intervened to establish their respective claims, to the end that his holding might be liquidated, and the proceeds thereof distributed among them according to their respective rights.

One-half of the properties of the corporation was conveyed by Kent to the predecessor in title of the corporation. Kent had a note in the sum of $345,000.00, secured by a vendor's lien and deed of trust lien, upon such half interest. An agreed judgment was entered in the District Court of Navarro County, providing the property covered by Kent's mortgages, then in the hands of the receiver, should be immediately conveyed by the receiver to him, and a credit of $125,000.00 on his indebtedness allowed therefor; that the receiver should pay to Kent, as a further credit on such indebtedness, the proceeds of all properties covered by his liens; and further provided that the net value of the crude oil taken by the receiver from the mortgage leases should be paid to Kent, as a secured creditor, amounting to $14,272.69, which sum the receiver was ordered to pay to said Kent. This agreed judgment was approved and entered on the minutes of the court.

Unsecured creditors, including Texas Co. and Humble Oil & Refining Company, moved that the agreed judgment be reformed, urging as a matter of law and fact, Kent did not have, nor was he entitled to, a lien on the crude petroleum taken by the receiver from the wells on the mortgaged premises.

The Waco Court of Civil Appeals, with opinion by Chief Justice Gallagher, affirmed the judgment of the trial court, holding:

"The appointment of the receiver herein terminated the possession of the corporation as between it and appellee. The receiver, on taking possession of the properties, was not the mere successor of the corporation. He was the representative of the court, holding and operating such properties for the preservation thereof and for the benefit of such parties as might ultimately establish an interest therein.

\*   \*   \*   \*   \*   \*

"The court being, through its receiver, in possession of the entire properties of the

insolvent corporation, and having before it all the interested parties, could promptly determine and effectively enforce the rights of each of them, and thereby avoid the unnecessary expense and delay incident to other and further actions.

\*　　\*　　\*　　\*　　\*　　\*

"The trial court had, under his general equitable powers, full discretion and authority to protect appellee from loss from the action of the receiver in operating said leases and taking and appropriating such oil, as the essential principles of right and justice demanded. He heard the evidence, and, in the exercise of such discretion and authority, *found the amount of injury resulting to appellee from the depletion of his security by the receiver, and ordered that he be compensated therefor out of the funds, which were augmented to the extent of the net value of the oil so taken.*" (Emphasis added.)

The syllabi 4 and 5 on page 858 succinctly state the holding of the Court of Civil Appeals.

In conclusion, after the foreclosure of appellee's lien by the trustees sale, and not until then, the appellee had her cause of action against appellant in equity because the security of the note of $10,000.00 was diminished by the money received from the royalties from the mortgaged property by appellant, which was waste, and the independent executor of the estate is not entitled to same as an unjust enrichment thereof.

The primary duty of the independent executor was to wind up the estate by paying its debts and distributing the property to those taking under the will as speedily as possible. Fidelity and the utmost good faith are always required of a personal representative in the performance of his duties in transactions in regard to the estate. The independent executor occupies a position of trust to all parties with an interest in the estate. He is a trustee. Bell v. Still, 389 S.W.2d 605, 607 (Waco, Tex.Civ.App., 1965) opinion expressly adopted by Supreme Court of Texas, 403 S.W.2d 353 (1966). Not only is it his duty to disclose fully and fairly all pertinent facts as candidly as possible, but he may not take advantage of those whom he represents, including a creditor. 18 Tex.Jur. 2d, p. 302, § 346. In Cartwright v. Minton, 318 S.W.2d 449 (Eastland, Tex.Civ.App., 1958, writ ref. n. r. e.), on page 453, the court held that an independent executor is a fiduciary in this language:

"This evidence conclusively demonstrates that appellant was the executor under his father's will and continued to discharge his duties as executor after he obtained the deeds from appellees. 'The term "fiduciary" is derived from the civil law. It is impossible to give a definition of the term that is comprehensive enough to cover all cases. Generally speaking, it applies to any person who occupies a position of peculiar confidence towards another. It refers to integrity and fidelity. It contemplates fair dealing and good faith, rather than legal obligation, as the basis of the transaction. The term includes those informal relations which exist whenever one party trusts and relies upon another, as well as technical fiduciary relations. 25 C.J. p. 1118; Peckham v. Johnson, Tex.Civ.App., 98 S.W.2d 408; Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786, 120 A.L.R. 720; Swiney v. Womack, 343 Ill. 278, 175 N.E. 419; Abbitt v. Gregory, 201 N.C. 577, 160 S.E. 896; Niland v. Kennedy, 316 Ill. 253, 147 N.E. 117; Lindholm v. Nelson, 125 Kan. 223, 264 P. 50; Roecher v. Story, 91 Mont. 28, 5 P.2d 205; Roberts v. Parsons, 195 Ky. 274, 242 S.W. 594; Seely v. Rowe, 370 Ill. 336, 18 N.E.2d 874; Bliss v. Bahr, 161 Or. 79, 87 P.2d 219.' Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Tex. 565, 160 S.W.2d 509, 512.";

and quoted from Murphy v. Cartwright, 202 F.2d 71 (U.S. Court of Appeals, 5th Cir., 1953), a part of which is here quoted:

"As executor of the estate, appellee occupied a position of trust to all parties having an interest in the estate. Because

of his confidential and fiducial relationship to appellant he owed her the highest degree of fidelity. Strates v. Dimotsis, 5 Cir., 110 F.2d 374. It was his duty to fully and fairly disclose to her all of the pertinent facts as candidly as possible. The law will not permit him to take advantage of those whom he represents. Thaw v. Thaw, 2 Cir., 27 F.2d 729; Collier v. Collier, 137 Ga. 658, 664, 74 S.E. 275. When a person sustains toward another a position of trust and confidence, his failure to disclose facts that it is his duty to disclose, is as much a fraud as an actual misrepresentation of the true facts."

Such principles are not new. As early as 1873, in Cock, Adm. v. Carson & Lewis, 38 Tex. 284, 285 (1873), on page 287, our Supreme Court held:

An administrator, no more than an individual acting for himself, will be allowed to pursue such a course in the management of the trust in his hands as to do gross injustice to other parties. Our laws regulating the settlement of the estates of deceased persons will allow no such thing, much less do they require it."

In Corpus Juris Secundum, Executors and Administrators, Vol. 33, it is said:

"H. WASTE, CONVERSION, OR EMBEZZLEMENT OF ASSETS

"§ 242. Liability and Extent Thereof in General

"a. In general

"b. Extent of liability

"a. In General

"An executor or administrator is personally liable for waste, or conversion or similar loss to the estate, in some instances even where the misconduct is that of a third person; and a third person may be liable for the misconduct of the representative, where such third person knowingly acquired the property or participated in the misconduct.

"An executor or administrator is personally liable to those who are interested in the estate as heirs, distributees, creditors, or otherwise, for waste, or for conversion, misapplication, or embezzlement of the assets of the estate.";

and again on page 1250, § 243:

"§ 243. Waste

"Waste is any mismanagement of the estate of a decedent, or other breach of duty resulting in loss, by an executor or administrator. In a proper case a representative may be restrained from committing waste."

I would overrule appellant's Point of Error No. 2.

In Palmer v. Bizzell, 229 S.W. 971 (Galveston, Tex.Civ.App., 1921, no writ), the following statement in the syllabus recites the holding:

"Where remedies were alternative and concurrent and not inconsistent, the pursuit of one will not exclude the other until a satisfaction is had."

To the same effect is the decision in Rick v. Farrell, 266 S.W. 522 (Dallas, Tex.Civ. App., 1924, no writ).

The above holding is cited with approval in Moseley v. Fikes, 126 S.W.2d 589 (Ft. Worth, Tex.Civ.App., 1939, affirmed by Supreme Court in Fikes v. Moseley, 136 Tex. 386, 151 S.W.2d 202 [1941]).

Appellant did not contend in the trial court, nor in this court, that he had any defense of estoppel by election of remedies. That question is not before us. Holland Texas Hypotheek Bank v. Broocks, 266 S.W. 183 (Beaumont, Tex.Civ.App., 1924, error ref.); Betty v. Tuer, 292 S.W. 271 (Beaumont, Tex.Civ.App., 1927, no writ).

I agree with the majority opinion that appellant's other points of error are without merit and would overrule them.

It is frustrating to write an opinion when all facts are not before this court.

I would affirm the judgment of the trial court.